**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

BRENDA L. HOLMAN-BRADFORD,                    No. CIV S-07-2678-CMK

        Plaintiff,

   vs.                                                       MEMORANDUM OPINION AND ORDER

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

_____/

      Plaintiff, who is proceeding with retained counsel, brings this action for judicial

review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

Pursuant to the written consent of all parties, this case is before the undersigned as the presiding

judge for all purposes, including entry of final judgment. See 28 U.S.C. § 636(c). Pending

before the court are Plaintiff's motion for summary judgment (Doc. 24), Defendant's cross-

motion for summary judgment (Doc. 25), and Plaintiff's reply (Doc. 26).

## I. PROCEDURAL HISTORY

      Plaintiff applied for social security benefits on October 14, 2003. In the

application, plaintiff claims that her disability began on October 30, 1999. Plaintiff claims that

her disability is caused by a combination of cervical degenerative disc disease, lumbar

degenerative disc disease, chronic obstructive pulmonary disorder (COPD), coronary artery disease, left shoulder tendinopathy, carpal tunnel syndrome and major depressive disorder. Plaintiff's claim was initially denied.[1]  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on April 11, 2006, before Administrative Law Judge ("ALJ") John P. Garner.  In a November 10, 2006, decision, the ALJ concluded that plaintiff is not disabled based on the following findings:

1.  The claimant has not engaged in substantial gainful activity since October 30, 1999, the alleged onset date (20 CFR 416.920(b) and 416.971 *et seq*.).

2.  The claimant has the following severe impairments: cervical degenerative disc disease, lumbar degenerative disc disease, chronic obstructive pulmonary disorder (COPD), coronary artery disease (CAD), left shoulder tendinopathy, and major depressive disorder (20 CFR 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.  After careful consideration of the entire record the undersigned finds that the claimant has the residual functional capacity for lifting and carrying 10 pounds occasionally and 5-10 pounds frequently; standing and/or walking for about 6 hours during an 8-hour workday; sitting for about 6 hours in an 8-hour workday; occasionally pushing/pulling less than 10 pounds; occasionally reaching (including overhead reaching); and occasionally climbing, balancing, kneeling, crouching, crawling, and stooping.  She should avoid exposure to temperature extremes, humidity/wetness, and irritating inhalants.  Further, she can complete simple and some detailed tasks, and sustain persistence on same, and interact with the public in a distant way.

5.  The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.  The claimant was born on June 10, 1961 and was 42 years old on the date the application was filed, which is defined as a younger individual age 18-44 (20 CFR 416.963).

/ / /

---

[1]  Plaintiff had previously been denied benefits, on or about April 17, 2002.  The ALJ here determined that "new and material evidence had been received, including evidence in regards to new impairments (COPD and CAD).  Thus the prior determination is not binding." (CAR 41).

7.    The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.    The claimant has acquired work skills from past relevant work (20 CFR 416.968).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 416.960(c), 416.966 and 416.968(d)).

10.   The claimant has not been under a "disability," as defined in the Social Security Act, since October 29, 2003 (20 CFR 416.920(g)), the date the application was filed.

After the Appeals Council declined review on October 19, 2007, this appeal followed.

## II. SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following evidence, summarized below:

### A.    Medical Records

#### 1.    Treatment Records

##### a.    Physical Health[2]

Plaintiff had an MRI of her shoulder on December 10, 2003.  The impression was "No significant shoulder impingement.  There is some increased linear signal in the infraspinatus tendon which may represent tendinopathy/tendonitis.  No through-and-through tear is appreciated."  (CAR 502).

On January 20, 2004, Plaintiff was seen by Dr. Ahsan for a neurological evaluation on a referral from Plaintiff's treating physician, Dr. Bacon.  (CAR 413-18).  Her chief complaint was noted as neck and back pain, with a history of migraine headaches.  She also

---

[2]    A majority of Plaintiff's treatment notes are largely illegible, and Plaintiff has not provided a comprehensive summary of her treatment.  However, Plaintiff's physical RFC is not at issue in this case.  Therefore, the court has included the evaluations and assessments of Plaintiff's treating physicians, and some treatment notes, but has not summarized all of the treatment notes.

1   complained about tingling and numbness in the right hand.  Upon examination, Dr. Ahsan found

2   Plaintiff's lungs to be clear bilaterally, no rales or wheeze; no deformity or scoliosis in her

3   extremities.  Her mood was normal, affect appropriate, speech fluent, language comprehensible,

4   memory normal, concentration and reasoning normal, no hallucinations, no apraxia.  Her muscle

5   mass and tone were normal, power was 5/5 on both sides, upper and lower, and she had increased

6   tone in the neck muscles.  She complained of hip pain.  Her reflexes were 2+ all over, plantars

7   were flexor.  Pain, touch and vibratory senses were normal.  Coordination, finger-nose, heel-shin

8   and rapid alternating movements were normal.  Her gait was normal.

9           Dr. Ahsan found her "clinical symptoms and physical examination are consistent

10  with the diagnosis of migraine headache, carpal tunnel syndrome of the right hand, back pain and

11  depression."  (CAR 415).  Dr. Ahsan started her on Neurontin, and suggested she continue her

12  other medications.  He ordered an EEG of the brain and MRI of the lumbar spine.  He also

13  performed nerve conduction studies on the right and left median and ulnar nerves.  He found the

14  study to be "consistent electrically with mild carpal tunnel syndrome predominantly axonal at the

15  wrist on the right.  Amplitudes were decreased on right side more than left in comparison."

16  (CAR 417).

17          The cervical spine MRI Dr. Ahsan ordered was completed on February 14, 2004.

18  The impression was:

19          1.      Some degenerative disc changes at C5-6 with some disc
                bulge and spurring, eccentric and laterally prominent to the left
20              side causing some obliteration of the ventral thecal sac and some
                left-sided neural foraminal narrowing as above.
21          2.      Milder diffuse disc bulge at C4-5 as above."  (CAR 501).

22          The thoracic spine MRI Dr. Ahsan ordered was also completed on February 14,

23  2004.  The impression was:

24          1.      Prominent areas of decreased signal posterior to the spinal
                cord, within the thecal sac.  These are of uncertain significance,
25              and this could relate to CSF flow artifact versus vascular or cystic
                abnormality posterior to the cord in the subarachnoid spaces.
26              Correlation is recommended with follow-up contrast-enhanced

4

scanning of thoracic spine as above.
2.      No disc herniation or severe stenosis in the thoracic region.
(CAR 500).

Finally, Plaintiff had a lumbar spine MRI also on February 14, 2004, again ordered by Dr. Ahsan.  The impression was: "1. Some mild disc bulging at L5-S1, and to a lesser extent at L4-5, as above."

On May 20, 2004, Plaintiff had elective cardiac catheterization.

On December 23, 2004, Plaintiff had a heat CT scan without and with contrast for black outs.  The impression was:

1.      No acute intracranial abnormality.
2.      Question of some subtle decreased density in the pons which may be artifactual but can be correlated clinically and evaluated further by MR, if indicated.  See above.  (CAR 292).

Plaintiff was seen in the emergency room on January 20, 2005 for a cough, shortness of breach and chest pain.  (CAR 489-90).  Upon examination, her lungs were bronchial sounding, but her chest x-ray showed no acute changes.  There was no evidence of any pneumonia or infiltrate.  Her urine drug screen was positive for marijuana and opiates.  An EKG showed a normal sinus rhythm with no acute changes.  She was diagnosed with chest pain and bronchitis, was discharged with no new medication and was referred back to her primary care doctor for follow up.

On June 28, 2005, Plaintiff was admitted into the hospital for elective permanent pacemaker placement, which she tolerated well.  She was discharged on June 30, 2005.

On December 30, 2005, Plaintiff's treating physician, Dr. Bacon, completed a Medical Source Statement of Ability to do Work-Related Activities (Physical).  (CAR 504-07).  Dr. Bacon opined Plaintiff's ability to lift was limited to occasionally lifting ten pounds, frequently lifting five to ten pounds.  He opined she was able to stand and/or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday.  She was also limited in her ability to push and/or pull, in both her upper and lower extremities, to occasional

and less than ten pounds.  Dr. Bacon stated these findings were supported by "muscle spasms lumbar & cervical spine; degenerative disc disease lumbar spine."  (CAR 505).  He limited her to occasionally climbing, balancing, kneeling, crouching, crawling, and stooping.  He also found her ability to reach limited to occasionally, and she should avoid temperature extremes and humidity/wetness.  No other manipulative, visual, communicative, or environmental limitations were noted.[3]

### b.      Mental Health

Plaintiff was seen at Volunteer Behavioral Health Care System[4], on referral by her primary care physician.  The CAR includes medical records dated September 27, 2004, through August 2, 2005 (CAR 542-63), and September 22, 2004, through March 9, 2007 (CAR 652-88).  At her initial intake on September 27, 2004, Plaintiff was assessed by Wendy Bryant, CMSW.  Plaintiff reported having domestic difficulties, and suffering from sleeping difficulties, crying spells, panic attacks, and isolation.  Her appearance, behavior and psychomotor were noted as appropriate.  Her speech was normal, but her affect was blunted and her mood was depressed.  Her remote memory, and her insight, judgment, and impulse ratings were good.  However, her recent memory and concentration were poor.  Ms. Bryant diagnosed Plaintiff with major depressive disorder, single episode, severe with psychotic features and anxiety disorder NOS.  Her global assessment of functioning ("GAF") was noted at 50.  The plan was to refer Plaintiff to a psychiatrist for counseling.

Plaintiff then saw Mary Rutherford, MSN APRN BC, at Volunteer Behavioral Health Care System, on December 7, 2004.  Plaintiff reported having been depressed for a long time, and on medication since 1993.  She was taking Paxil, Remeron and amitriptyline.

---

[3]      Dr. Bacon completed a second statement on April 24, 2006, which was essentially the same, except it restricted her to never climbing, and removed the environmental limitations.

[4]      It appears that Volunteer Behavioral Health Care is also referred to as Cumberland Mental Health.

Plaintiff's appearance, affect, behavior and psychomotor were all appropriate.  Her speech was normal, but her mood was depressed and anxious.  Her recent memory was poor; her remote memory, concentration and her insight and judgment ratings were fair; and her insight, judgment and impulse levels were limited.  She was again diagnosed with major depressive disorder, single episode, severe with psychotic features, anxiety disorder NOS, with a GAF of 50.  Her Paxil and Remeron prescriptions were increased, and counseling was recommended.

On January 18, 2005, Plaintiff saw Mary Rutherford again.  She reported no change in her depression or feelings of helplessness.  Her depression was extreme, her anxiety was moderate.  Her affect was subdued; range of affect was narrow; speech/thought process was logical; thought content/perception was normal; and memory/orientation was normal.  She was diagnosed with major depressive disorder, recurrent severe with psychotic features specify: mood-congruent, and panic disorder with agoraphobia.  It was noted she was making progress toward goal, and her level of functioning was slight.

Plaintiff saw Mary Rutherford again on March 8, 2005.  Plaintiff's anxiety and depression were noted as moderate.  Her affect was subdued; range of affect was narrow; speech/thought process was slow; thought content/perception was phobias; and memory/orientation was mildly impaired.  No change in her diagnosis.  She was scheduled to see Dr. Beasley at her next appointment.

Plaintiff did see Dr. Beasley on August 2, 2005.  Her problem was noted as anxiety, depression, history of psychosis, and forgetfulness.  She had moderate anxiety, mild depression, and insomnia.  She reported the Remeron was not helpful, but the Paxil seemed to be helping.  Her affect was subdued; range of affect was narrow; speech/thought process was logical; thought content/perception was normal; and memory/orientation was normal.  Plaintiff was again diagnosed with major depressive disorder, recurrent severe with psychotic features specify: mood-congruent, and panic disorder with agoraphobia.  Dr. Beasley noted her GAF at 50, and her level of functioning was unchanged.

1        Plaintiff then saw Cindy Lemon, MSN APRN BE, at Volunteer Behavioral Health

2   Care System on April 24, 2006.  Plaintiff reported a history of depression and anxiety since 1993.

3   She had been taking Paxil, but had been without for two days and was starting to fee "real bad."

4   She reported difficulty with memory, crying spells, isolation, panic attacks, anxiety, and sleeping

5   problems.  Her appearance, behavior and psychomotor were appropriate.  Her speech and thought

6   content were normal.  Her affect was flat, her mood depressed.  Her thought flow was organized,

7   her memory was fair, her concentration was good and her insight was limited.  Her diagnosis was

8   the same, with GAF of 50.

9        Plaintiff was then discharged from Volunteer Health Care System on January 19,

10  2006, with an addition discharge note on March 7, 2007.  The primary reason for her discharge

11  was documented as failure to appear at appointments.

12              **2.    Evaluations**

13          Albert Gomez, M.D., Consultative Examiner

14        On December 19, 2003, Plaintiff had a consultative physical examination with Dr.

15  Gomez.  (CAR 402-09).  She presented with a complaint of low back pain, wherein she reported

16  the pain as sharp, severe, constant, which radiates to her right leg, is increased with lifting and

17  bending, and decreased with rest and pain medication.  She also complained about left shoulder

18  pain, which was sharp, severe, constant, which radiates to her neck, and is increased with

19  reaching overhead but decreased with pain medication and rest.  She also indicated shortness of

20  breath, wheezing, and cough.

21        Plaintiff presented alert and oriented, in no acute distress.  She walked with a

22  limp, but without any walking device.  She was able to get on and off the exam table with

23  moderate difficulty.  Her lungs had moderate wheezing bilaterally without rales and rhonchi.

24  Plaintiff's right shoulder had a full range of motion, but her left shoulder had moderate

25  tenderness to palpation with abduction 80 degrees and forward elevation 80 degrees.  Internal

26  and external rotation was normal.  Elbows, wrists, fine finger movements, and pinch grip were

all normal, full range of motion.  Both hips and ankles had full range of motion.  Plaintiff's left knee had a full range of motion, but her right knee had mild tenderness to palpation with flexion 115 degrees and extension normal.  Her handgrip was good bilaterally, motor strength was 5/5 in the upper and lower extremities.  Her deep tendon reflexes were 2+ bilaterally in the upper and lower extremities.  The vibratory innervation was intact.  Her straight leg raising test was negative in the lying and sitting position.

She had full range of motion in the lumbosacral spine, but was done with pain. No tenderness to palpation though.  She was able to tandem walk, heel walk, toe walk, squat, and stand on one leg normally.  On the pulmonary function test, "Her premedication testing was consistent with normal spirometry.  Bronchodilators were not indicated."  (CAR 404).

Dr. Gomez assessed that Plaintiff was able to occasionally lift twenty pounds, stand or sit at least six hours in an eight-hour work day with normal breaks, but could not do any lifting overhead.

### Patricia A. Jasnowitz, Ed.D., DDS Psychological Evaluation

On January 7, 2004, Plaintiff had a consultative psychological evaluation with Dr. Jasnowitz.  (CAR 410-12).  At the exam, Plaintiff reported having memory changes, being forgetful, unable to remember easy words, difficulty concentrating and thinking, being agitated, fidgeting and being restless, feeling nervous, being worried, panicking if lots of people are around, being suspicious of other people, being irritable and easily provoked to anger, wanting to be left alone, feeling worthless, and having thoughts of death.  She reported doing nothing social, spending her day in and out of bed, and having her children help take care of her.

Dr. Jasnowitz found Plaintiff was oriented to person, place, time and situation. Her mood was dysphoric, her affect was mood congruent, she was tearful and she reported she cries every day.  She reported no auditory hallucinations, but has thoughts that someone is calling her name when no one is there.  She reported seeing people "in her presence."  (CAR 411).  Dr. Jasnowitz opined that Plaintiff did not exhibit signs of psychosis.  Her insight was intact, her

1    impulse control and judgment were fair.  Plaintiff was unable to recall three objects after one

2    minute, but could do so with prompts.  After five minutes she recalled two of the three objects,

3    and the third with prompts.  She was able to perform serial sevens by using her fingers, making

4    one error.  She exhibited knowledge of current events, repeated a five-digit number, and a three

5    digit number in reverse.  Dr. Jasnowitz opined that she appeared to be of average intellectual

6    functioning, but her scores in arithmetic, reading and spelling rated at the second grade level.

7    Her diagnosis was major depressive disorder, recurrent, severe without psychotic features, and

8    her GAF was at 50 - 55.  Dr. Jasnowitz opined Plaintiff was moderately limited in understanding

9    and remembering; sustained concentration and persistence; interaction with others; and adapting

10   to changes/requirements.

11                        Psychiatric Review Technique Form (PRTF), January 22, 2004

12                        Disability Determination Service (DDS) completed a psychiatric review, noting

13   affective disorders.  Plaintiff was assessed with mild limitations in daily living activities;

14   moderate limitations in maintaining social functioning and concentration, persistence, or pace.

15   No episodes of decompensation were noted.  She was also found to be moderately limited in her

16   ability to understand, remember, and carry out detailed instructions; maintain attention and

17   concentration for extended periods; perform activities within a schedule, maintain regular

18   attendance, and be punctual within customary tolerances; complete a normal workday and

19   workweek without interruptions from psychologically based symptoms and perform at a constant

20   pace without an unreasonable number and length of rest periods; interact appropriately with the

21   general public; accept instructions and respond appropriately to criticism from supervisors; and

22   set realistic goals or make plans independently of others.  She was found not significantly limited

23   in her ability to remember locations and work-like procedures; understand and remember very

24   short and simple instructions, carry out very short and simple instructions, sustain an ordinary

25   routine without special supervision; work in coordination with or proximity to others without

26   being distracted by them; ask simple questions or request assistance; get along with coworkers or

peers without distracting them or exhibiting behavioral extremes; maintain sociably appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; and travel in unfamiliar places or use public transportation.

It was noted that Plaintiff would "be able to complete simple and some detailed tasks and sustain persistence on the same.  Will interact in a distant way with the public.  Will accept supportive criticism from supervisors.  Will need assistance setting realistic goals. Consistent with psych CE's comments."  (CAR 435).[5]

Physical Residual Functional Capacity Assessment, February 5, 2004

DDS completed an RFC finding Plaintiff capable of occasionally lifting twenty pounds, frequently lifting ten pounds.  She could stand and/or walk and sit about six hours each in an eight-hour day, but she must periodically alternate sitting and standing to relieve pain or discomfort.  She had unlimited ability to push and/or pull, limited by weight as above.  All postural limitations were noted as occasional, including climbing, balancing, stooping, kneeling, crouching, and crawling, due to mild degenerative joint disease of spine.  No manipulative, visual, or communicative limitations were noted.  The only environmental limitation noted was for fumes, odors, dusts, gasses, and poor ventilation, which she should avoid even moderate exposure to.

**B.**     **Hearing Testimony**

**1.**     **Plaintiff's Testimony**

Plaintiff testified at the administrative hearing without a representative.  She testified her previous work included working at a liquor store where she ran the entire store, including lifting a keg of beer when purchased.  She can no longer lift a keg.  She completed the

/ / /

_____

[5]     This PRTF was reviewed February 12, 2004.  The medical consultant agreed with each assessment.

seventh grade and is able to read and write somewhat, "I mean I guess I'm not illiterate." (CAR 712).

She testified her worst problem is her back, including her lower disks, lower lumbars, and neck.  She loses her balance a lot, can't get down or back up.  She has been told by her treating physician that her back cannot be repaired.  Her doctor has not given her any medication for her back pain, but she does take Soma, Lortab, Xanax, and Paxil plus two types of blood pressure medication.

Her second worst problem is her breathing and remembering.  It is hard for her to breath if she walks any length.  She smokes, but is trying to quit.  She is down from two and a half packs a day to half a pack. To help with her breathing, she is on Advair and a breathing machine, plus inhalers.  Six months prior, or so, she was told her breathing problems were from emphysema.

Her number three problem his "my head, remembering, memory loss." (CAR 715).  Then her legs and arms going numb, like her  "hips and everything's just numb" from sitting. (CAR 716).  The cause of her numbness is from her back.  She sees Dr. Bacon every three months, or sooner if she has a problem.  She is also having problems with her blood pressure.

As for her heart problems, she has a pacemaker which was put in because she was having blackouts where her heart would stop for eight seconds.  It worked well in the beginning, but it has had some problems requiring adjustments.  The pacemaker has shifted, so they are going to have to go in and fix it again.  Some of her arteries are clogged.  She has also been given a cane, or quad, because she gets off balance and dizzy.

She also testified that she has a chemical imbalance, because she thinks she is bipolar.  For this condition, she states she takes Paxil.  If she does not take her medication, she does not know who she is, where she is, what she is doing,  "I've just lost it." (CAR 718).

/ / /

1    Plaintiff testified that she tries to pick up after herself, but cannot clean the house.
2    She has a drivers's license and knows how to drive, but does not drive due to her medication.
3    She changes positions all the time, alternating between lying down, sitting, and standing.  It is
4    painful for her to go to bed, and her hips and everything go numb and tingle so she has to get up
5    throughout the night.

### 2.    Witness Testimony

7    Plaintiff's daughter, Jennifer Dover, testified on her mother's behalf.  She stated
8    that everything her mother testified to was accurate.

### 3.    Vocational Expert Testimony

10    The ALJ called Jane Brenton to testify as a Vocational Expert (VE).  Ms. Brenton
11    testified that Plaintiff's past work, a liquor store clerk, would be rated as a heavy and semiskilled
12    position.  From liquor store clerk, she would have transferable skills to the light category, in
13    cashier positions, with 68,000 positions in Tennessee and 3.5 million nationally.  Cashier is rated
14    as semiskilled, with an SVP of three or four.  At the sedentary semiskilled level, there are also
15    cashier positions, approximately 35,000 in Tennessee and 2.5 million nationally.

16    The ALJ set forth Plaintiff's previous RFC, determined in connection with her
17    previous application, as including the ability to lift and carry a maximum of twenty pounds,
18    needing the option to sit or stand at will, occasionally climb, balance, stoop, crouch, kneel and
19    crawl, avoid irritating inhalants, with marked limitations in the ability to interact appropriately
20    with the public, moderate limitations in her ability to make judgements on simple work related
21    decisions, social functioning and concentration, persistence or pace, mild restrictions in activities
22    of daily living, but no repeated episodes of decompensation.  Based on that RFC, the VE testified
23    that with the marked restrictions in dealing with the public, she could not work with people and
24    she could not work as a cashier.  If that restriction was discounted, she could do cashiering.

25    Taking Dr. Gomez's limitations of occasionally lifting 20 pounds, sit/stand at
26    least six hours in an eight-hour day with normal breaks, and limited overhead lifting to none, the

VE testified that describes light work.  That hypothetical would allow cashiering work, such as Plaintiff did in the past, because there should be no overhead lifting.

The ALJ explained Dr. Jasnowitz's evaluation of Plaintiff, which indicated a diagnosis of major depressive disorder, severe without psychotic features, a current level of functioning at 50 to 55, describing moderate limitations in understanding, remembering, and carrying out instructions; sustaining concentration and persistence; interaction with others; and adapting to change.  With moderate limitations in those areas and typically functioning in the moderate range of impairment on the Global Assessment of Functioning, the VE testified that such a person would be able to perform the cashier jobs.  Taking into account Cumberland Mental Health's assessment of a GAF at 50, which the ALJ noted is at the top of the range 41 to 50, indicating serious impairment in social, occupational, or school functioning, the ALJ inquired whether taking that impediment or impairment of mental functioning as persistent and on going, would allow the performance of any jobs, even unskilled, to which the VE replied no.

If the limitations were moderate in understanding, remembering, and carrying out detailed instructions; moderate difficulty maintaining attention and concentration for extended periods, performing activities within a schedule, maintaining attendance, completing a normal work day or work week without interruption, getting along with the public, accepting instructions and responding to criticism from supervisors, and setting realistic goals or making independent plans, as set forth by the DDS, the VE stated those limitations would generally allow the performance of all cashier jobs at semiskilled.

The VE further testified that pretty much all of the light and sedentary cashiering jobs afford a sit/stand option.  At the sedentary level, all of them would; at the light level at least fifty percent would.  It is not an uncommon accommodation.

Taking into consideration Dr. Bacon's stated limitations, the ALJ asked the VE to think about an individual who can lift and carry ten pounds occasionally, five to ten pounds frequently; stand and walk about six hours in an eight-hour day, sit for six hours; is limited in

14

upper extremity pushing or pulling to less than ten pounds occasionally; occasionally perform postural activities and reaching, including overhead; unlimited handling, fingering and feeling; limited tolerance to temperature extremes, humidity, and wetness.  The VE responded that sounded like almost the full range of light, which would allow cashiering jobs.

In addition to the cashiering jobs, the ALJ asked the VE to identify unskilled light and/or sedentary jobs with a sit/stand option, only occasional reaching, working in clean air, very limited interaction with the public, and moderate limitations for concentration, persistence, or pace; social interaction with co-workers or supervisors; and adaptation.  The VE responded at the light level, there would be inspector positions, 14,000 in Tennessee and 497,000 nationally; production helpers, at 13,000 in Tennessee and 452,000 nationally; order checkers, 2,300 in Tennessee and 83,000 nationally.  At the sedentary level, there would also be some inspectors, 7,000 in Tennessee and 250,000 nationally; addresser, 1,500 in Tennessee and 191,000 nationally; and order checkers, 1,200 in Tennessee and 61,0000 nationally.

The VE further testified that Plaintiff would not be significantly limited due to her pacemaker, even with the limitations such as microwave ovens and magnetic fields.  She clarified that some cashier positions are medium, such as the one Plaintiff held in the past, but others are not.  She further clarified that a limitation as to reaching in all directions to occasionally was consistent with the light and sedentary cashiering positions she identified.  She also stated that it is not congruent with all cashier positions, but that there are many more cashier positions than she identified.

### III.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is " such evidence as a reasonable mind might accept as adequate to support a

1    conclusion." Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including

2    both the evidence that supports and detracts from the Commissioner's conclusion, must be

3    considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v.

4    Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's

5    decision simply by isolating a specific quantum of supporting evidence.  See Hammock v.

6    Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

7    findings, or if there is conflicting evidence supporting a particular finding, the finding of the

8    Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

9    Therefore, where the evidence is susceptible to more than one rational interpretation, one of

10   which supports the Commissioner's decision, the decision must be affirmed, see Thomas v.

11   Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

12   standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th

13   Cir. 1988).

14                            **IV.  DISCUSSION**

15        Plaintiff argues the ALJ erred in two ways: (1) the ALJ rejected Plaintiff's treating

16   psychiatrist's opinion without specific and legitimate reasons; and (2) the Vocational Expert's

17   testimony was inconsistent with the Dictionary of Occupational Titles ("DOT").

18           **A.    MEDICAL OPINIONS**

19        In relation to the medical opinions, Plaintiff argues that the ALJ rejected her

20   treating psychiatrist opinion without proper reasoning.  Specifically, she argues she was given a

21   Global Assessment of Functioning (GAF) of 50 by Dr. Beasley, which was consistent with all

22   treating individuals at Volunteer Behavior Health Care System, indicating serious symptoms or

23   serious impairment in social, occupational, or school functioning, and the ALJ erred in not

24   articulating specific and legitimate reasons for rejected Dr. Beasley's opinion.

25        The weight given to medical opinions depends in part on whether they are

26   proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d

821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating

professional, who has a greater opportunity to know and observe the patient as an individual,

than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285

(9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given

to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4

(9th Cir. 1990).

        In addition to considering its source, to evaluate whether the Commissioner

properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are

in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an

uncontradicted opinion of a treating or examining medical professional only for "clear and

convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.

While a treating professional's opinion generally is accorded superior weight, if it is contradicted

by an examining professional's opinion which is supported by different independent clinical

findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035,

1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be

rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester,

81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of

the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a

finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and

legitimate reasons, the Commissioner must defer to the opinion of a treating or examining

professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional,

without other evidence, is insufficient to reject the opinion of a treating or examining

professional.  See id. at 831.  In any event, the Commissioner need not give weight to any

conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion);

see also Magallanes, 881 F.2d at 751.

Here, the ALJ accepted the CE's opinion, stating:

> I accept the opinion of Dr. Jasnowitz that the claimant has a moderate limitation in understanding and remembering; sustaining concentration and persistence; interacting with others; and adapting to changes/requirements.  Dr. Jasnowitz's opinion is well supported by the objective medical evidence and other substantial evidence of record.  The opinion of the non-examining State agency psychological consultant has also been accepted, because it is consistent with the record of evidence.
>
> However, the assessment provided by Cumberland Mental Health is not accepted, because it is internally inconsistent.  Specifically, social worker Wendy Bryant completed an assessment stating that the claimant had a <u>mild</u> limitation in activities of daily living, and <u>moderate</u> limitations in interpersonal functioning; concentration, task performance, and pace; and adaptation to change.  However, she also estimated the claimant's GAF score at 50, indicating <u>serious</u> problems.  (CAR 46).

The ALJ further noted that:

> Treatment notes from Cumberland Mental Health establish the claimant only presented for treatment on five occasions during the period of September 2004 through August 2005.  The treatment notes also reflect that the claimant has a tendency to focus on her physical health problems, rather than her mental health problems. (CAR 46).

Defendant argues the ALJ properly rejected the opinions of Cumberland Mental Health personnel, and provided proper reasons for so doing.  Specifically, Defendant argues that a GAF score is not equivalent to an RFC, nor does a low GAF necessarily require a finding of disabled.  Plaintiff counters that this case is different because the ALJ questioned the VE whether an individual with limitations indicated by the GAF score could perform any work, to which the VE testified negatively.

As set forth above, Plaintiff was only seen a few times for mental health treatment.  Between September 27, 2004, her first assessment, through her last treatment visit on April 24, 2006, and her discharge in 2007, Plaintiff was only seen six times.  The first visit was the assessment by the social worker, Wendy Bryant.  Plaintiff then saw MSN Rutherford three times, Dr. Beasley one time, and MSN Lemon one time.  Relying on one treatment visit with Dr. Beasley, Plaintiff argues the ALJ improperly rejected Dr. Beasley rating her at a GAF of 50.

18

1    The undersigned agrees with the Defendant that a GAF score does not equate to a

2  finding of disability.  "While a GAF score may be of considerable help to the ALJ in formulating

3  the RFC, it is not essential to the RFC's accuracy.  Thus, the ALJ's failure to reference the GAF

4  score in the RFC, standing alone, does not make the RFC inaccurate."  Howard v. Comm'n of

5  Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002); see also Bayless v. Barnhart, 427 F.3d 1211, 1217

6  (9th Cir. 2005) (finding a GAF of 40 does not necessarily require a determination of disability).

7  That is true here, where the ALJ properly relied on the examining physician's opinion. .

8    The ALJ set out a detailed summary of the Plaintiff's treatment at Cumberland

9  Mental Health in his opinion.  (CAR 44).  He included in this summary the social worker's

10  assessment as well as her visits with MSN Rutherford, noting Plaintiff's complaints, and that the

11  "assessment was more focused on [her] physical problems, rather than her mental problems."

12  (CAR 44).  The ALJ noted that this was also true for her visits in January, March and August

13  2005, and that the treatment notes were unrevealing.  Further, while Plaintiff argues the ALJ

14  improperly discussed a social worker's findings rather than Dr. Beasley, the undersigned finds

15  that argument unavailing as there was only one visit with Dr. Beasley and Plaintiff does not point

16  to any assessment of Plaintiff by Dr. Beasley.

17    The undersigned finds there was sufficient support for the ALJ's decision in

18  accepting the CE's opinion over Plaintiff's treating doctor.  The ALJ set forth specific reasons

19  for accepting the examining physician's findings which conflicted with Plaintiff's treating

20  physician.  The CE's medical opinion was based on independent clinical findings, and her

21  opinion conflicted with Plaintiff's treating physician.  In such a situation, the ALJ is able to

22  resolve the conflict, which was done appropriately here.

23    In addition, simply because the ALJ included a GAF score in one of the multiple

24  hypotheticals he propounded to the VE, does not require the ALJ to conclude that such a GAF

25  renders Plaintiff disabled.  Regardless of the different hypotheticals the ALJ propounds to the

26  VE, the only one that matters is the one the ALJ relies on in his opinion.  See Embrey v. Bowen,

19

1    849 F.2d 418, 422-23 (9th Cir. 1988).

2           The undersigned finds the ALJ's treatment of the medical opinions is supported

3    by proper reasons and free of legal error.

4           **B.    VOCATIONAL EXPERT**

5           Plaintiff also argues the VE's testimony conflicted with the DOT, and that conflict

6    was not sufficiently addressed by the ALJ or the VE.

7           Other than as addressed above, Plaintiff does not argue the ALJ erred in

8    determining her RFC.  That RFC included a limitation in her abilities to lift/carry, stand/walk, sit,

9    push/pull, reach, postural and environmental limitations, as well as her psychological limitations.

10   These limitations were set forth in the ALJ's hypothetical to the VE, as detailed above.  In

11   response, the VE testified to general jobs Plaintiff could perform consistent with those

12   limitations, including some cashier positions, as well as inspector, production helper, order

13   checker, and addresser positions, rated at both light and sedentary.  The VE did not give specific

14   DOT codes for any of the positions she found Plaintiff capable of performing.  The ALJ set forth

15   in his opinion that he accepted the VE's testimony and found Plaintiff capable of performing

16   cashier positions at either the light or sedentary level.  Again, no DOT codes were indicated.

17          Plaintiff now argues the cashier positions set forth in the DOT require a person to

18   be able to frequently reach in order to perform such position, and because the VE did not specify

19   which position, with a DOT code, she was referring, there is no way to reconcile the conflict

20   between the necessity of reaching frequently and Plaintiff's limitation to reaching only

21   occasionally.  Defendant counters that there is no such conflict, and even if there was, such a

22   conflict would be harmless.

23          Once a claimant establishes she can no longer perform her past relevant work, the

24   burden shifts to the Commissioner to establish the existence of alternative jobs available to the

25   claimant, given her age, education, and work experience.  See Burkhart v. Bowen, 856 F.2d

26   1335, 1340 (9th Cir. 1988) (citing Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986)).

1  This burden can be satisfied by either applying the Medical-Vocational Guidelines ("Grids"), if

2  appropriate, or relying on the testimony of a VE.  See id.  The testimony of a VE should

3  generally be consistent with the DOT, although neither "trumps" the other if there is a conflict.

4  See Massachi v. Astrue, 486 F.3d 1149, 1153 (9th Cir. 2007).  If there is an inconsistency

5  between the VE's testimony and the job descriptions in the DOT, the ALJ must resolve the

6  conflict.  See id. (citing SSR 00-4p).

7       Pursuant to Social Security Ruling (SSR) 00-4p, the Ninth Circuit has found the

8  ALJ is explicitly required to determine if a VE's testimony deviates from the DOT, and if so

9  there must be sufficient support for that deviation.  See id.  Specifically, the Court found:

10       SSR 00-4p unambiguously provides that "[w]hen a [vocational
         expert] ... provides evidence about the requirements of a job or
11       occupation, the adjudicator has an *affirmative responsibility* to ask
         about any possible conflict between that [vocational expert] ...
12       evidence and information provided in the [*Dictionary of
         Occupational Titles*]."  SSR 00-4p further provides that the
13       adjudicator "will ask" the vocational expert "if the evidence he or
         she has provided" is consistent with the Dictionary of Occupational
14       Titles and obtain a reasonable explanation for any apparent
         conflict.

15

16  Id. at 1152-53 (emphasis in original).  Only after making such a determination, and obtaining an

17  explanation if necessary, can the ALJ rely on the testimony of a VE.

18       Here, as set forth above, the ALJ proposed a hypothetical to the VE which

19  included Plaintiff's reaching limitation, that the person would be limited to reaching

20  occasionally.  The VE testified that those limitations would not satisfy a full range of light, but

21  almost.  Based on that, she identified the positions of inspector, production helper, and order

22  taker at the light level, and inspector, addresser, and order checker at the sedentary level.  If the

23  limitation was limited overhead lifting instead of reaching, the VE testified that would be light

24  work, and cashiering positions should not have overhead lifting.  In addition, the VE testified, for

25  clarification, that if the limitations included pushing and pulling occasionally less than ten

26  pounds, and reaching in all directions, including overhead, was limited to occasional, that would

1   be consistent with light and sedentary cashiering.  (CAR 733-34).  The ALJ then found, as set

2   forth in his decision, that Plaintiff was limited in her ability to reach, to only occasionally, but

3   that she was able to perform the positions as cashier, either light or sedentary.

4           As Plaintiff argues, the ALJ never asked the VE whether her testimony was

5   consistent with the skills as set forth in the DOT for the positions identified.  Also as Plaintiff

6   argues, it appears that at least some of the cashier positions require frequently lifting, which

7   would be in excess of Plaintiff's abilities, and could constitute a conflict between the VE's

8   testimony and the DOT.  There is no resolution of that conflict, nor is there any specificity as to

9   which cashier position the VE and ALJ found Plaintiff could perform.  Without that specificity,

10  the court cannot made an adequate determination of whether there is an actual conflict or not.

11  However, Plaintiff has provided information as to cashier positions listed in the DOT which all

12  require frequently lifting.  The undersigned therefore finds a conflict between the VE's testimony

13  and the DOT.  As such, the ALJ had an affirmative responsibility to inquire as to the reasons and

14  evidentiary basis for the VE's deviation. The ALJ did not make any such inquiry, which

15  constitutes error.

16          Defendant's argument that any error was harmless in not persuasive.  The

17  undersigned acknowledges that the Ninth Circuit indicated such an error can be harmless.

18  However, the Court identified two situations where such an error can be harmless, if there is no

19  conflict or if the VE "provided sufficient support for her conclusion so as to justify any potential

20  conflicts."  Massachi, 486 F.3d at 1154 n.10.

21          Defendant argues that the VE identified other positions Plaintiff could perform,

22  and therefore the failure to resolve any conflict between the DOT's description of cashier and the

23  VE's finding that Plaintiff can perform such a position is harmless.  However, as to the inspector

24  positions the VE identified, which the Defendant points to, the VE failed to provide DOT codes.

25  Defendant argues there is an inspector position within the DOT, code 712.684-050, which would

26  accommodate Plaintiff's limitations, including reaching, and therefore is not in conflict with the

VE's testimony.  However, the ALJ did not accept such a position.  Instead, the ALJ specifically found Plaintiff capable of performing the cashier positions based on the VE's testimony.  As the VE's testimony did not clarify the conflict, or provide any support for her determination Plaintiff could perform in such a position, the undersigned cannot find the error harmless.

On remand, the ALJ must specifically inquire as to whether the VE's testimony, as to the positions available given the hypothetical limitations, deviates from the DOT and if so, whether there is any reasonable explanation for such deviation.

## V.  CONCLUSION

For the foregoing reasons, this matter will be remanded under sentence four of 42 U.S.C. § 405(g) for further development of the record and/or further findings addressing the deficiencies noted above.

Accordingly, IT IS HEREBY ORDERED that:

1.      Plaintiff's motion for summary judgment is granted;

2.      The Commissioner's cross motion for summary judgment is denied;

3.      This matter is remanded for further proceedings consistent with this order; and

4.      The Clerk of the Court is directed to enter judgment and close this file.


DATED:  April 7, 2010

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE